# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 20-1843V

| | |
|---|---|
| NELSON FERRY,<br><br>                    Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                    Respondent. | Chief Special Master Corcoran<br><br>Filed: August 28, 2025 |

*Jonathan Joseph Svitak*, Shannon Law Group, P.C., Woodridge, IL, for Petitioner.

*Jamica Littles*, U.S. Department of Justice, Washington, DC, for Respondent.

### RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES[1]

On December 14, 2020, Nelson Ferry filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges a left shoulder injury related to vaccine administration ("SIRVA") following his receipt of an influenza ("flu") vaccine on October 29, 2019. Petition (ECF No. 1).[3] The case was assigned to the Office of Special Masters ("OSM")'s Special Processing Unit ("the SPU").

---

[1] Because this decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

[33] The Petition and subsequent filings from both parties inadvertently state a vaccination date of October 2**8**, 2019. The correct date is the 2**9**th. *See* Ex. 2 at 5-6 (contemporaneous vaccine administration record).

The parties' settlement discussions reached an impasse, and they have fully briefed entitlement and damages.[4] For the reasons discussed below, I find that Petitioner has preponderantly established the onset of left shoulder pain within 48 hours post-vaccination, and he is otherwise entitled to compensation for a Table SIRVA. Petitioner's Motion for a Ruling on the Record to that effect (ECF No. 58) is **GRANTED.** As damages, I award $85,000.00 for past pain and suffering; $280.98 for past unreimbursable medical expenses; and $3,013.84 for past mileage expenses (calculated at the IRS business rate). Petitioner's request for home remodeling labor expenses is denied.

## I. Evidence[5]

- Petitioner was a seventy-year-old retired police sergeant, with a remote history of bilateral rotator injury and repair in 2011, "but he had not experienced any documented symptoms since that time." Response at 3 (citing Ex. 3 at 4; Ex. 4 at 2 – 5; Ex. 5 at 1).

- The flu vaccine was administered in his left deltoid at a county health office in Illinois on October 29, 2019. Ex. 2 at 5-6.

- Thirty-four (34) days later (December 2, 2019), the record of a telephone call with a primary care nurse notes that Petitioner had called "stating injection **site of flu vaccine is painful, wanted to know if there was specific [treatment] for this type of incident.**" Ex. 3 at 2 (emphasis added). The nurse advised: "if it becomes too painful or bothersome he needs to be seen," and Petitioner responded that he had an existing appointment for December 16th. *Id.*

- The next day, a different nurse called Petitioner regarding unrelated lab results. Petitioner reported an ongoing "**sore arm from flu vaccine back in October,**" and that "at times… he can barely lift a glass." Ex. 3 at 3 (emphasis added).

- On December 16, 2019, Petitioner attended a pre-scheduled primary care appointment for management of chronic conditions. Ex. 3 at 4, 6; *see also* Ex. 8 at 37 – 40 (appointment six months earlier). He also reported left shoulder pain particularly with extension, **"since he had his flu vaccination in October."** Ex. 3 at 4 (emphasis added). The record's physical examination section states "normal" range of motion ("ROM") and the record does not contain a specific assessment

---

[4] *See* Rule 4(c) Report filed Apr. 8, 2024 (ECF No. 49) (identifying potentially outstanding records); Petitioner's Exs. 12 and Supp. Statement of Completion filed Sept. 16, 2024 (ECF Nos. 52-53); Petitioner's Damages Exhibits - Exs. 13-14 and Motion for a Ruling on the Record Regarding Entitlement and Damages (hereinafter "Brief") filed Jan. 22, 2025 (ECF Nos. 57-58); Response filed Mar. 24, 2025 (ECF No. 59) Reply filed Apr. 9, 2025 (ECF No. 60). The matter is ripe for adjudication.

[5] While I have not specifically addressed every medical record, or all arguments presented in the parties' briefs, I have fully considered all records as well as arguments presented by both parties.

or diagnosis for the shoulder complaint. *Id.* at 6-7. But the primary care physician ("PCP") gave Petitioner "some exercises to increase his range of motion," as well as recommending topical diclofenac gel and a referral to formal physical therapy ("PT") (for both the acute shoulder complaint, and chronic back pain). *Id.* at 7. The PCP cautioned Petitioner against taking oral non-steroidal anti-inflammatories that could raise his blood pressure, affect his kidneys, and increase his risk of coronary disease. *Id.* Later that day, Petitioner's wife followed up about the prescription "for sleep, that would be non-addictive" and the primary care practice ordered the diclofenac. *Id.* at 9 – 10, 24.

- After a more than six-month gap in any medical encounters,[6] Petitioner obtained an orthopedic evaluation on May 5, 2020, of his left shoulder (as well as his knees). Ex. 12 at 18. Petitioner recounted that his flu shot was followed **"within hours [by] severe pain to the shoulder"** as well as marked limitations in range of motion and strength." *Id.* (emphasis added). "Since that point in time his symptoms have persisted." *Id.* Petitioner reported that the pain was disrupting his activities of daily living and sleep, a pain cream had not provided "any relief," and the pain currently rated 8/10. *Id.* On exam, the left shoulder's active ROM was reduced, but passive ROM was well-maintained. *Id.* at 20. He had positive drop arm and empty can signs, and weakness in the rotator cuff but not the deltoid, triceps, or biceps. *Id.* The orthopedist tentatively assessed a rotator cuff tear, provided home exercises to help prevent adhesive capsulitis, and ordered an MRI. *Id.* at 21.

- On a May 14, 2020 questionnaire filled out prior to performance of the MRI, Petitioner wrote that his left shoulder pain **"began after flu shot 10/29/19."** Ex. 4 at 6 (emphasis added). The MRI visualized "evidence of the previous rotator cuff repair with complete rupture of the supraspinatus tendon"; edema and tearing at the subscapularis muscle and proximal tendon; subluxation of the humeral head, narrowing at the subacromial interval and moderate arthrosis of the acromioclavicular ("AC") joint. Ex. 12 at 22.

- At a May 20, 2020 orthopedics follow-up, Petitioner reported ongoing "great difficulty with strength and [ROM] actively to his left shoulder." Ex. 12 at 24. After reviewing the MRI, the orthopedist assessed AC joint osteoarthritis and a "retracted complete tear of supraspinatus a[nd] partial-thickness tear of subscapularis," for which he recommended ROM maintenance exercises and consultation with a colleague-shoulder specialist. *Id.* at 26.

---

[6] Petitioner recalls that he and his wife took a previously-scheduled vacation to Florida from roughly January 1 – March 1, 2020. After returning to Illinois, he scheduled an orthopedic evaluation of his left shoulder for March 17, 2020, then postponed the appointment in light of the emerging Pandemic. Ex. 1 at ¶¶ 11-16.

- At their June 4, 2020 initial evaluation, the shoulder specialist recorded a history of left shoulder pain that **"began in October, immediately following a flu shot."** Ex. 12 at 27 (emphasis added). The pain had persisted and currently rated 6–8/10. *Id.* On exam, the shoulder had forward elevation of 160 degrees "with some effort," 0 degrees external rotation, 3+ infraspinatus strength, and 4/5 supraspinatus strength. *Id.* at 29. The shoulder specialist assessed a rotator cuff tear with some supraspinatus involvement. *Id.* He administered a subacromial steroid injection, and instructed Petitioner to "begin" and "pursue" formal physical therapy ("PT") "diligently for a minimum of 2 to 3 months," before following up for either a repeat steroid injection, or possible surgical intervention (specifically, either arthroscopic rotator cuff revision or reverse arthroplasty). *Id.* at 30.

- Two days later, the PCP recorded that Petitioner's shoulder injury had begun **"about two hours"** after his flu vaccination. Ex. 3 at 18 (emphasis added). The PCP summarized the treatment course to date, noted that the steroid injection had helped, and that Petitioner would eventually need surgery. *Id.* The PCP did not provide any other treatment of the shoulder, instead focusing on Petitioner's other chronic conditions. *Id.*

- Six months later, on December 8, 2020,[7] Petitioner followed up with the shoulder specialist's physician's assistant ("PA") – reporting that the first steroid injection had provided "very good relief, but now his symptoms have returned." Ex. 12 at 31. Currently, he described an "underlying ache" which increased to "sharp, stabbing pain" with activity; weakness; and limited ROM. *Id.* He received a second steroid injection. *Id.* at 33.

- At a June 7, 2021 follow-up with the same PA, Petitioner reported that his left shoulder had ongoing daily pain ranging from 4-6/10 with activity and at night, and ongoing weakness. Ex. 12 at 35. Petitioner was considering shoulder surgery after "supervising a remodeling of his home this summer." *Id.* On physical exam, the left shoulder's forward elevation was 90 degrees and external rotation was 70 degrees. *Id.* at 36. These seem to be active ROM measures, because the PA also commented there was "no crepitus with passive [ROM] of the shoulder" and a negative Speed's test. *Id.* The supraspinatus and infraspinatus muscles were weak (4/5). *Id.* Assessing a complete rotator cuff tear, the PA administered a third steroid injection and invited Petitioner to return as needed, potentially in August 2021 (two months later) for a pre-surgical discussion. *Id.* at 37.

---

[7] Sometime in 2020, Petitioner moved to Tennessee. But he continued traveling (hundreds of miles round-trip) to his established providers, including orthopedists, in Illinois. *See, e.g.*, Ex. 1 at ¶ 2; Ex. 9 at 15; Brief at 33.

4

- After a ten-month treatment gap, Petitioner met with the orthopedic surgeon specializing in treatment of the shoulder on April 14, 2022. Ex. 12 at 39. Petitioner reported that his symptoms had "progressed"; he had "wanted to avoid any consideration of surgery during the COVID outbreak but now feels it may be time." *Id.* On exam, the shoulder had active forward elevation of 90 degrees and external rotation of 80 degrees; those measures were "improve[d] passively but with pain." *Id.* The supraspinatus and infraspinatus muscles were weak (3/5). *Id.* The surgeon reviewed the option of a reverse total shoulder arthroplasty which carried the risk of 3% for infection, 2% for fracture, and 2% for dislocations and an overall success rate of 85%. *Id.* at 40. The arthroplasty would have to be followed by a sling for 4-6 weeks and therapy for several months. *Id.* Petitioner wished to proceed with that surgery, and he was told to obtain medical and cardiology pre-operative clearances. *Id.* In the interim, he would continue to use protected body mechanics and Tylenol (because he reportedly could not take other pain medicines). *Id.*

- Two months later, at an orthopedics evaluation of knee pain, Petitioner mentioned that he still planned to undergo shoulder surgery. Ex. 12 at 42-44. But there are no further records pertaining to his shoulder.

- Petitioner states[8] that by December 2022, he had decided to forego surgery due to the risks and uncertain outcome. Ex. 10 at ¶ 2. But Petitioner reported ongoing, "likely permanent" shoulder pain preventing activities such as lifting overhead; lifting a gallon of milk; dressing himself; maintaining his home; and playing golf. Ex. 10 at ¶¶ 3-4; *see also* Ex. 11 at ¶ 7 (March 2023 affidavit alleging ongoing injury).

- Petitioner also claims extensive experience remodeling five past homes. Around the time of the October 2019 vaccine, he was planning to remodel his home. But due to his shoulder injury and doctors' instructions to limit activities, Petitioner could not perform the work himself, instead paying two contractors for their labor. *See* Ex. 10 at ¶ 2; Ex. 11 at ¶¶ 3-7.

## II. Factual Findings and Ruling on Entitlement

### A. Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must demonstrate, by a preponderance of evidence, all matters required under Section

---

[8] Petitioner's Ex. 1 is a notarized affidavit. In contrast, his supplemental statements at Exs. 10-11 are not properly termed affidavits, because they are not notarized – but they are sworn under penalty of perjury. *See* 28 U.S.C.A. § 1746 (providing that such a statement may be given like force and effect as an affidavit).

5

11(c)(1), including the factual circumstances surrounding his claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Hum. Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). Contemporaneous medical records are presumed to be accurate. *See Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Hum. Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Hum. Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)).

In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[9] a petitioner must establish that she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying QAI are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the

---

[9] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of his injury for more than six months, died from his injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. *See* Section 11(c)(1)(A)(B)(D)(E).

6

underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g., NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

### A. Analysis

At issue is whether Petitioner suffered new left shoulder pain within forty-eight (48) hours after receiving the flu vaccine on October 29, 2019. 42 C.F.R. §§ 100.3(a)(XIV)(B), (c)(10)(ii). Preponderant evidence supports such a finding.

Respondent contends that the "actual onset of Petitioner's left shoulder symptoms is unknown" because of the initial delay in documentation, followed by apparently "vague" reporting. Rule 4(c) Report at 10-11. But Petitioner persuasively observes that his initial delay (with the first call to the primary care practice at 34 days, and the first in-person evaluation at 48 days post-vaccination) is neither unreasonable nor uncommon for SIRVA claims. Brief at 18.[10]

In addition, Petitioner consistently described his persistent shoulder pain as starting with the vaccination, using language that can be reasonably understood to refer to a 48-hour timeframe. *See, e.g.*, Ex. 3 at 3 ("sore arm from flu vaccine back in October"); *id.* at 4 ("since he had his flu vaccination in October"); Ex. 12 at 18 (flu shot followed "within hours [by] severe pain to the shoulder"); Ex. 4 at 6 ("began after flu shot"); Ex. 12 at 27 ("began in October, immediately following a flu shot"); Ex. 3 at 18 ("about two hours" after flu shot). Such language has been *consistently* interpreted to mean "within 48 hours of vaccination." *Flowers v. Sec'y of Health & Hum. Servs.*, No. 20-285V, 2024 WL 2828211, at *11 (Fed. Cl. Spec. Mstr. May 8, 2024) (internal parentheticals and citations omitted), *mot. for rev. den'd*, 173 Fed. Cl. 613 (2024). Petitioner adds that to the extent his earliest reports were somewhat vague (as recorded by triage nurses), his later reports, in response to more specific questioning by his physicians, more specifically describe onset within 48 hours. Brief at 20-22.[11]

Petitioner also notes that the medical records recording his reports of onset are supplemented by his later statements – which endorse shoulder pain onset specifically within 48 hours after the vaccination, and which statements constitute objective evidence about facts within his personal knowledge. Brief at 19, citing *James-Cornelius v. Sec'y of*

---

[10] *Accord e.g.*, *Osgood v. Sec'y of Health & Hum. Servs.*, No. 21-0479V, 2025 WL 2390938 at *5 (Fed. Cl. Spec. Mstr. July 15, 2025) (reviewing that the petitioner "did not initially delay treatment significantly, but instead messaged [her physician] only one month after vaccination"); *Brewer v. Sec'y of Health & Hum. Servs.*, No. 21-0664V, 20205 WL 2303624 at *5 (Fed. Cl. Spec. Mstr. July 7, 2025) (reiterating that an individual may delay medical treatment especially for a possible vaccine injury to the shoulder, due in part to the expectation of temporary injection site pain; thus, "a one-month delay in seeking treatment is wholly unremarkable"); *but see Timberlake v. Sec'y of Health & Hum. Servs.*, No. 20-1905V, 2025 WL 721730 at *3 (Fed. Cl. Spec. Mstr. Feb. 19, 2025) (reviewing the relationship between initial treatment delays and initial injury severity).

[11] Respondent cites *Bulman* for the proposition that "While such language [e.g., "since"] certainly supports a finding that Petitioner suffered left-sided shoulder pain *some time* after his receipt of the flu vaccine, it does *not* support a finding that he more likely than not suffered onset of his condition within 48 hours of vaccination." Rule 4(c) Report at 13, citing *Bulman v. Sec'y of Health & Hum. Servs.*, No. 19-1217V, 2021 WL 4165349, at *6 (Fed. Cl. Spec. Mstr. Aug. 12, 2021). *Bulman*'s fact pattern contained many other vagaries, inconsistencies, and unexplained treatment gaps contributing to the petitioner's inability to establish shoulder pain onset within 48 hours post-vaccination. *Bulman*, 2021 WL 4165349, at *4 – 5. Absent such additional issues, the somewhat more liberal approach to vague onset language (interpreted in SIRVA petitioners' favor) will often be appropriate. *Flowers*, 2024 WL 2828211, at *11.

8

*Health Servs.*, 984 F.3d 1374, 1380 (Fed. Cir. 2021). For all of the foregoing reasons, Petitioner has preponderantly established a Table SIRVA onset.

### B. Factual Findings on Remaining SIRVA QAI Criteria and Statutory Requirements

Petitioner's success in meeting the remaining QAI requirements is not disputed,[12] and I find that they have been preponderantly satisfied. The record does not contain preponderant evidence that Petitioner had a history of shoulder pain or any other condition that would explain his post-vaccination symptoms. He exhibited reduced ROM, and his pain and ROM limitations were limited to the vaccinated shoulder.

The statutory requirements applicable to all claims are also preponderantly established. Petitioner received a covered vaccine in the United States. Ex. 2 at 5. He experienced residual effects of his injury for more than six months. *See, e.g.*, Ex. 12 at 18-21. And he states that he has never received an award or settlement of a civil action for the injury, nor has he filed a civil action. Ex. 1 at ¶¶ 28-29. Thus, Petitioner is entitled to compensation.

### III. Appropriate Compensation for Petitioner's Pain and Suffering

### A. Authority

In another recent decision, I discussed at length the legal standard to be considered in determining SIRVA damages, taking into account prior compensation determinations within SPU. I fully adopt and hereby incorporate my prior discussion in Sections I and II of *Timberlake v. Sec'y of Health & Hum. Servs.*, No. 20-1905V, 2025 WL 721730 at *1 – 3 (Fed. Cl. Spec. Mstr. Feb. 19, 2025).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and

---

[12] Respondent does not raise any arguments concerning the remaining SIRVA Table QAI requirements or statutory requirements. *See generally* Rule 4(c) Report and Response.

suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[13]

### B. Analysis

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact his awareness of his injury. Therefore, I analyze principally the injury's severity and duration.

When performing the analysis in this case, I review the record as a whole to include the medical records, declarations, affidavits, and all other filed evidence, plus the parties' briefs and other pleadings. I consider prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases. However, I base my determination on the circumstances of this case.

A thorough review of the medical records reveals that the October 2019 vaccination was followed within 48 hours by new shoulder pain, which was persistent but moderate to mild in severity. This assessment of the acute injury recognizes both Petitioner's rather prompt attempts at treatment – starting at just 34 days – but also his reliance on conservative measures offered by triage nurses and an established primary care physician, rather than any attempts towards more urgent care. Notably after the initial primary care consults, Petitioner vacationed for two months. His home exercises were apparently helpful in maintaining ROM, and he deferred formal PT – including for several months *before* the Pandemic's emergence.[14] Notwithstanding Petitioner's moderate to severe pain ratings on certain dates, those pain ratings were separated by months-long treatment gaps, and apparent periods of pain relief from his three steroid injections. He also deferred, and ultimately refused, the surgical intervention offered by his medical providers.

Although the medical records contain objective evidence of a shoulder injury involving pain, weakness, and reduced ROM persisting for roughly two and one-half years, the same evidence supports a conclusion that the injury was overall moderate to mild. And there is not clear medical endorsement, or other evidence beyond Petitioner's own affidavit, that his SIRVA continued at the same degree beyond that point in time, or

---

[13] *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

[14] The World Health Organization declared COVID-19 a pandemic on March 11, 2020. *See* Centers for Disease Control COVID-19 Timeline, at https://www.cdc.gov/museum/timeline/covid19.html (last visited Aug. 26, 2025).

that it will be permanent. Instead, the lack of any further treatment efforts (e.g., formal PT at any time) suggests that any ongoing limitations were manageable with conservative measures. I also acknowledge Petitioner's account of how the SIRVA prevented him from enjoying his retirement and remodeling his own home – but those pursuits are distinguishable from disruptions to formal employment or other obligations such as caring for dependent family members.

Petitioner's request for future pain and suffering (specifically $500.00 per year) is not adequately supported, and his request for $125,000.00 for past pain and suffering is too high, despite the comparable matters he offers as guidance.[15] Brief at 31. Petitioner is correct that his medical records reflect a recommendation for surgery, which is not reflected in the *Dawson-Savard* decision. But the *Dawson-Savard* petitioner received from a treater an endorsement of "permanent impairment," and experienced significantly more extensive treatment attempts during the first two years – including an ER visit, 13 steroid and trigger point injections, 35 sessions of formal PT, and a temporary light duty work restriction. *Dawson-Savard*, 2020 WL 4719291 at *3; Response at 27. Even with Petitioner's injury coinciding with the Pandemic, his much more conservative treatment course dictates a lower award.

Petitioner's second case, *Fry,* is also not a good fit – in part because of the *Fry* petitioner's treatment attempts starting just one day post-vaccination, prescription of opioid pain medications; formal PT sessions; and inability to undergo a recommended surgery because of her significant comorbidities and advanced age. *Fry*, 2020 WL 8457671, at *6-7; Response at 26.

At the same time, Respondent's proposed award of just $47,000.00 falls short. As an initial matter, it is unclear whether Respondent complied with the order to "assume that Petitioner [had] prevail[ed]" in establishing entitlement for a Table SIRVA, upon setting forth Respondent's damages valuation.[16] Respondent actually states that he has adopted a "consistent litigative risk settlement posture in the present case" – even while seeking to distinguish this case's pain and suffering valuation from that in *Dawson-Savard*. Response at 27. This assumption inherently undervalued what would constitute a fair damages award if Petitioner prevailed (as he has).

---

[15] Citing *Dawson-Savard v. Sec'y of Health & Hum. Servs.*, No. 17-1238V, 2020 WL 4719291 (Fed. Cl. Spec. Mstr. July 14, 2020) (awarding $130,000.00 for past pain and suffering, plus $500.00 per year for future pain and suffering); *Fry v. Sec'y of Health & Hum. Servs.*, No. 18-1091V, 2020 WL 8457671 (Fed. Cl. Spec. Mstr. Dec. 16, 2020) ($120,000.00 past).

[16] Scheduling Order entered Oct. 22, 2024 (ECF No. 55) at 1.

11

In addition, Respondent's comparison to *Piccolotti* (*see* Response at 24-25)[17] is unpersuasive because that petitioner received one steroid injection in August 2019, followed by a lengthy treatment gap, with his second steroid injection in January 2022. *Piccolotti*, 2023 WL 3165383 at *5. The present Petitioner received *three* total steroid injections just *months* apart from one another (in June 2020, December 2020, and June 2021) – evidencing a more severe injury during that treatment course. The repeated recommendations of surgery here also support an upward adjustment.

Respondent cited other cases featuring similar treatment efforts – but in a more compressed period, followed by medical assessments of substantial recovery. Response at 20-24.[18] In contrast, the present Petitioner's treatment spanned a longer period, but with several months-long gaps partially explained by the Pandemic, and relief achieved from the three steroid injections.

It is more helpful to compare Petitioner to other individuals with similar treatment gaps, and where surgery options were declined despite some evidence of an ongoing shoulder injury. But Petitioner's injury did not significantly disrupt caregiving responsibilities (compared to the *Hein* petitioner who was tending to a newborn and a toddler), and he has not identified any barriers to treatment (compared to the *T.S.* case, where the petitioner's former employer refused to cover ongoing treatment, including the surgery recommended by her medical providers).[19] Therefore, he should receive a lower award – $85,000.00.

## IV. Expenses

### A. Authority

A petitioner may recover "actual unreimbursable expenses incurred before the date of judgment awarding such expenses which (i) resulted from the vaccine-related

---

[17] Citing *Piccolotti v. Sec'y of Health & Hum. Servs.*, No. 20-0135V, 2023 WL 3165383 (Fed. Cl. Spec. Mstr. Mar. 31, 2023) ($45,000.00).

[18] *Citing e.g., Miller v. Sec'y of Health & Hum. Servs.*, No. 20-959V, 2023 WL 4312920 (Fed. Cl. Spec. Mstr. Jun. 1, 2023) (awarding $80,000.00 for past pain and suffering); *Williams v. Sec'y of Health & Hum. Servs.*, No. 19-1420V, 2024 WL 914908 (Fed. Cl. Spec. Mstr. Jan. 30, 2024) ($80,000.00); *George v. Sec'y of Health & Hum. Servs.*, No. 18-0426V, 2020 WL 4692451 (Fed. Cl. Spec. Mstr. Jul. 10, 2020) ($67,000.00); *Hartman v. Sec'y of Health & Hum. Servs.*, No. 19-1106V, 2022 WL 444456 (Fed. Cl. Spec. Mstr. Jan. 14, 2022) ($75,000.00); *Celuch v. Sec'y of Health & Hum. Servs.*, No. 18-0544V, 2021 WL 2368137 (Fed. Cl. Spec. Mstr. May 10, 2021) ($70,000.00).

[19] *See, e.g., T.S. v. Sec'y of Health & Hum. Servs.*, No. 21-441V, 2024 WL 5400462 (Nov. 19, 2024) (awarding $95,000.00 for past pain and suffering); *Hein v. Sec'y of Health & Hum. Servs.*, No. 19-943V, 2021 WL 4805232 (Fed. Cl. Spec. Mstr. Sept. 14, 2021) ($93,000.00).

injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation, developmental evaluation, special education, vocational training and placement, case management services, counseling, emotional or behavioral therapy, residential and custodial care and service expenses, special equipment, related travel expenses, and facilities determined to be reasonably necessary." Section 15(a)(1)(B).

### B. Out-of-Pocket Medical Expenses

Petitioner requests $808.33 for "SIRVA-related medical expenses that were not covered by his private health insurance." Brief at 32; citing generally to Ex. 13 (expense documentation). Respondent supports awarding $280.98, providing a helpful appendix of his review of the expense documentation and corresponding citations to the medical records. Response at 28 and Appendix 1. Petitioner's Reply does not offer any rebuttal or further explanation of the disputed expenses. Based on an independent review of the record, Respondent's objection on this matter has preponderant substantiation, and therefore I award $280.98 for past unreimbursable medical expenses.

### C. Mileage Expenses

Petitioner requests reimbursement for mileage costs associated with traveling to shoulder injury appointments with his established medical providers in Illinois, after moving to Tennessee, nine times in 2020-22. Petitioner drove either 580 or 594 miles roundtrip for each appointment, for a total of 5,262 miles. Applying the IRS "business rate," Petitioner requests a total of $3,013.84. Brief at 32-33. While agreeing that the mileage may be reimbursed, Respondent argues, at length, for application of the IRS's lower "medical rate" which would result in a lower award of $888.60. Response at 29-33 and Appendix 2.

Although Respondent argues that I should diverge from prior decisions in awarding the business rate mileage for a petitioner's medical appointments, I decline to do so at this time.[20] Accordingly, Petitioner is reimbursed $3,013.84 for Petitioner's mileage, at the business rate.

---

[20] *See e.g.*, *Evans v. Sec'y of Health & Hum Servs.*, No. 22-1125V, 2025 WL 2303787 (Fed. Cl. Spec. Mstr. July 7, 2025); *Chalgren v. Sec'y of Health & Hum Servs.*, No. 22-245V, 2025 WL 1649633 (Fed. Cl. Spec. Mstr. May 5, 2025); *Havis v. Sec'y of Health & Hum Servs.*, No. 21-583V, 2024 WL 5039036 (Fed. Cl. Spec. Mstr. Nov. 1, 2024); *Black v. Sec'y of Health & Hum Servs.*, No. 21-2164V, 2024 WL 3467272 (Fed. Cl. Spec. Mstr. June 11, 2024); *Perez v. Sec'y of Health & Hum Servs.*, No. 21-746V, 2024 WL 3030395 (Fed. Cl. Spec. Mstr. May 17, 2024); *Walter v. Sec'y of Health & Hum. Servs.,* No. 21-1461V, 2024 WL 1299576 (Fed. Cl. Spec. Mstr. Feb. 27, 2024); *Tappendorf v. Sec'y of Health & Hum Servs.*, No. 20-1592V, 2024 WL 1299566 (Fed. Cl. Spec. Mstr. Feb 23, 2024); *Sturdevant v. Sec'y of Health & Hum. Servs.,* No. 17-172V,

### D. Remodeling Labor Expenses

Finally, Petitioner requests reimbursement of $29,610.00 in paid labor for remodeling his home in 2021-22. Brief at 32; He has sworn under penalty of perjury that he had previously remodeled five homes while living in them, and he took great pride in completing such work. Ex. 11 at ¶ 3. Around the time of his October 2019 shoulder injury onset, he had been planning to remodel his current home – specifically the master bedroom and closet, kitchen, pantry, and garage. Ex. 10 at ¶ 5. He had planned to perform all the labor involved – including removing bathroom facilities and fixtures; installing showers, tubs, new floors and walls, plumbing, electrical, etc. *Id.* Petitioner maintains that due to the limitations his shoulder injury caused and based on his doctors' instructions to limit activities, instead of remodeling the home himself, he paid two contractors for their labor (over and above the costs of materials). Ex. 11 at ¶ 3. Petitioner would not have incurred those expenses "but for" his shoulder injury. *Id.*; *see also* Ex. 14 (documentation of remodeling expenses and the scope of work).

Petitioner argues that his remodeling labor expenses are analogous to the expenses for "gardening services, mending and alterations, and heavy housekeeping" awarded to a different petitioner with an established "propensity for performing such activities" prior to her vaccine injury. Brief at 31-32, citing *Hoisington v. Sec'y of Health & Hum. Servs.*, No. 19-1043V, 2024 WL 3913712 at *16-17 (Fed. Cl. Spec. Mstr. July 22, 2024).

Respondent opposes any such expenses because Petitioner's home remodel was not required to meet his "basic needs," not deemed medically necessary by any physician, not part of a life care plan, and not for any purpose enumerated in Section 15(a)(1)(B). Response at 18, 28-29.

Respondent's objection to this requested cost element is well-taken. The inquiry cannot center on Petitioner's previous propensity for performing an activity and resulting avoidance of an expense, but whether the expense itself is *compensable under the Act*. Some previous petitioners have received awards for home *maintenance*[21] which may fit within the definition of "residential… expenses." Section 15(a)(1)(B). But that wording

---

2024 WL 1045145 (Fed. Cl. Spec. Mstr. Feb 12, 2024); *Kleinschmidt v. Sec'y of Health & Hum. Servs.,* No. 20-680V, 2023 WL 9119039 (Fed. Cl. Spec. Mstr. Dec. 5, 2023).

[21] *See, e.g.*, *Hoisington*, 2024 WL 3913712 (awarding expenses for heavy housekeeping, gardening, and mending/altering Petitioner's own clothes); *Bryan v. Sec'y of Health & Hum. Servs.*, No. 14-898V, 2024 WL 3797739 at *23 (Fed. Cl. Spec. Mstr. July 15, 2024) (approving 15 hours per year of handyman services); *Grant v. Sec'y of Health & Hum. Servs.*, No. 20-1262V, 2024 WL 940275, at *7 (Fed. Cl. Spec. Mstr. Feb. 9, 2024) (approving lawn service costs).

14

cannot be stretched too far beyond tasks that keep a property habitable, to also cover an extensive remodel that seems more equivalent to "optimizing" the home to Petitioner's particular preferences. Petitioner admits that the remodel was planned *before* his vaccine and shoulder injury, and he does not identify any home modifications that were necessary to accommodate that medical condition. *See also Scheinfeld v. Sec'y of Health & Hum. Servs.*, No. 90-212V, 1991 WL 94360 at *2 (Fed. Cl. Spec. Mstr. May 20, 1991) (explaining that the Vaccine Act does not award expenses to "optimize the injured person's quality of life"). The remodeling expenses are denied.

## Conclusion

As explained above, **I conclude that Petitioner has established onset and all other entitlement requirements for a Table SIRVA. Thus, Petitioner is entitled to compensation in this case.**

**I also award Petitioner a lump sum payment of $88,294.82 (representing $85,000.00 for past pain and suffering,[22] $280.98 for past unreimbursable medical expenses, and $3,013.84 for past mileage expenses) to be paid through an ACH deposit to petitioner's counsel's IOLTA account for prompt disbursement.** This amount represents compensation for all damages that would be available under 42 U.S.C. § 300aa-15(a).

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[23]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[22] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[23] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.